UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| American Wire Group, LLC, *Plaintiff*, v. WTEC Holdings Corp. d/b/a WTEC Energy, *Defendant*. | No. 23 CV 4678 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

American Wire Group, LLC ("American Wire" or "AWG") and WTEC Holdings Corp. settled a dispute over allegedly defective photovoltaic cable American Wire purchased from WTEC. In this lawsuit, American Wire alleges (among other claims) that WTEC breached the settlement agreement. Recently, American Wire amended its complaint to add two claims for tortious interference with business expectation, which WTEC moves to dismiss. [Dkt. 53.] WTEC's motion is granted.

I. Background

The Court recounts the facts alleged in the Second Amended Complaint, which it takes as true for purposes of ruling on WTEC's motion to dismiss. *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022). American Wire supplies customers in the renewable energy sector with electric photovoltaic cables and wiring that it purchases from manufacturers, such as WTEC. [Dkt. 52 ¶¶ 20–21.] In February 2021, American Wire began issuing purchase orders, under which WTEC supplied large quantities of cable to American Wire; the parties agreed and WTEC certified that its cable met applicable industry standards. [*Id.* ¶ 34; *see id.* ¶¶ 23–40.] In June 2021,

1

American Wire began receiving complaints from customers about the insulation of cables it had supplied. [*Id.* ¶¶ 41–42.] American Wire alleges that these customers received cables manufactured by WTEC. [*Id.* ¶ 41.] Third-party testing of samples of WTEC's cable revealed that it did not perform as it should have. [*Id.* ¶¶ 43–45.]

American Wire sued WTEC in January 2022 over the allegedly defective cable. [*Id.* ¶ 46.] In October 2022, while the prior litigation was pending, one of American Wire's customers, Signal Energy, LLC, notified American Wire that the insulation on cable it installed at the Sunflower County Solar Project in Mississippi (the "Sunflower Project") was cracking. [*Id.* ¶ 47.] American Wire alleges that WTEC manufactured the Sunflower Project cable, and American Wire informed WTEC about the defects in that cable. [*Id.* ¶¶ 47–48.] In early 2023, American Wire and WTEC settled the prior litigation and executed a settlement agreement, under which WTEC would indemnify American Wire for claims related to the Sunflower Project. [*Id.* ¶¶ 49–52.]

American Wire then began to involve WTEC in its discussions with Signal related to the Sunflower Project; Signal made a formal demand of American Wire, which in turn made an indemnity demand of WTEC. [*Id.* ¶¶ 53–60.] WTEC denied the indemnity, which American Wire alleges breached the settlement agreement. [*Id.* ¶ 61.] American Wire sued, and its operative Second Amended Complaint adds two claims for tortious interference with business relationships. [Dkt. 52 ¶¶ 124–29.]

With respect to Signal, American Wire alleges that it "had a reasonable expectation of receiving future business opportunities to provide cable to Signal for other future projects." [*Id.* ¶ 62.] American Wire and Signal communicated about the

2

possibility of American Wire supplying Signal with cable for three projects called Wolf Run, Ragsdale, and Wheatland (the "Three Projects"). [*Id.* ¶¶ 65–66.] American Wire alleges that "WTEC knew, or reasonably should have known, about these potential additional business opportunities" because in the settlement agreement, WTEC "expressly acknowledged" that American Wire provided cable to Signal for the Sunflower Project. [*Id.* ¶¶ 63–64, 67.] WTEC allegedly "interfered in the business of AWG and Signal to prevent Signal from entering into agreements with AWG for the Three Projects." [*Id.* ¶ 68.] American Wire did not land these projects. [*Id.* ¶¶ 69–70.]

American Wire also alleges that it "maintained a longstanding and fruitful commercial relationship with" Remee Wire and Cable, its supplier, and because of this relationship expected to do business with Remee in the future. [*Id.* ¶¶ 71, 74.] Remee recently informed American Wire, however, that WTEC's president and CEO "requested Remee to terminate Remee's business relationship with AWG." [*Id.* ¶ 72.] WTEC allegedly knew about American Wire's expectation of future business with Remee, but because of WTEC's interference, Remee told American Wire in December 2023 that Remee would no longer do business with American Wire. [*Id.* ¶¶ 73, 75.]

WTEC moves to dismiss the tortious interference claims for failure to state a claim upon which relief can be granted. [Dkt. 53.] *See* Fed. R. Civ. P. 12(b)(6).

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleadings. "To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim to relief that is plausible on its face." *Page*, 52 F.4th at 346 (cleaned up). The Court takes factual allegations as true and draws reasonable inferences in the plaintiff's

3

favor, *id.*, but it need not take statements of law and conclusory factual allegations as true. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021).

### III. Analysis

The elements of a claim for tortious interference with a prospective business relationship under Illinois law are: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996).[1] WTEC argues that the Second Amended Complaint fails to state a claim for tortious interference in connection with Signal or Remee.

In response, American Wire does not rest only on its allegations in the Second Amended Complaint. It "submit[s] materials outside the pleadings to illustrate the facts [it] expects to be able to prove" [Dkt. 59 at 4 n.2 (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012))], and supplies "additional factual information" to support its claims. [*Id.* at 5.] WTEC argues that the Court should disregard the additional allegations because they are not consistent with the Second Amended Complaint, but rather are an attempt to save inadequately pleaded claims from dismissal. [Dkt. 60 at 1–3.]

---

[1] To be precise, *Anderson* called this claim "intentional interference with prospective economic advantage," 667 N.E.2d at 1299, but it is the same claim American Wire brings. *See Dustman v. Advocate Aurora Health, Inc.*, 192 N.E.3d 47, 60 (Ill. App. Ct. 2021) (quoting *Anderson* for the elements but labeling the claim "tortious interference with a prospective business relationship"); [Dkt. 53-1 at 7 n.3 (noting various ways to phrase the claim)].

The Court appreciates WTEC's position, but it will nevertheless incorporate the additional facts into its analysis because it would grant American Wire leave to replead these claims, albeit with reluctance. A plaintiff usually receives at least one chance to amend its complaint. *Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022). American Wire has received two, so the Court could exercise its discretion not to permit further amendment at this point. However, three factors tip the scales in favor of incorporating the additional allegations into the Court's analysis in lieu of granting leave to amend: (1) this is the first motion to dismiss, so American Wire has not "already had multiple chances to cure deficiencies," *see id.* (citation omitted); (2) this case is less than a year old, and fact discovery remains open, so permitting these claims to proceed if they can be pleaded properly will not "cause substantial delay and prejudice," *id.* (citation omitted); and (3) the Court prefers to decide cases on the merits, *see Atkins v. Gilbert*, 52 F.4th 359, 361 (7th Cir. 2022) (per curiam). Therefore, the Court will evaluate the viability of American Wire's claims based on the facts alleged in its Second Amended Complaint plus the additional facts it includes in its response brief, but beyond that, the Court will allow no further amendment to the pleadings.

### A.   Count VII: Signal

WTEC argues that Count VII fails to establish any of the first three elements of a claim based on tortious interference with American Wire's expectation of future business with Signal. [Dkt. 53-1 at 8–12.] Considering the allegations in the Second Amended Complaint and American Wire's response brief, the Court disagrees.

5

### 1. Reasonable Expectation

WTEC argues that American Wire fails to plausibly allege a reasonable expectation of entering into business with Signal for the Three Projects. [Dkt. 53-1 at 12.] American Wire "must allege more than a mere hope that potential customers would do business with it in the future." *Life Spine, Inc. v. Aegis Spine, Inc.*, 2021 WL 83550, at *7 (N.D. Ill. Jan. 11, 2021) (citation omitted); *accord Anderson*, 667 N.E.2d at 1299 ("The hope of receiving a job offer is not a sufficient expectancy." (citations omitted)). The Second Amended Complaint contains only cursory allegations about American Wire's expectation of securing business with Signal on the Three Projects. [Dkt. 52 ¶ 65 ("In 2023, AWG and Signal had communications regarding AWG supplying cable to Signal for [the Three Projects] …."), ¶ 66 ("Based on those communications, AWG had a reasonable expectation of entering into agreements with Signal to supply cable for the Three Projects ….").] Vague allegations about these "communications" are insufficient to state a plausible claim, given that Illinois law requires more than a mere hope of future business.

The facts in American Wire's response brief, however, bring the claim up to snuff. In a September 11, 2023 email exchange, a Signal representative stated that she was "working on the [purchase orders]" for cable for two of the Three Projects, Wolf Run and Ragsdale. [Dkt. 59-1 at 2; *see* Dkt. 59 at 3–4.] Based on this communication, it is plausible to infer that American Wire had more than a mere hope of obtaining business on the Wolf Run and Ragsdale projects. *Cf. Anderson*, 667 N.E.2d at 1299; *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503 (7th Cir. 1998) (affirming the dismissal of a tortious interference claim where the plaintiff "allege[d]

6

merely that he wished to continue working as a commercial pilot," but not "that he had been offered a job by any other airline, or even that he had interviewed or applied for such positions"). The fact that Signal's email discussed only two of the Three Projects does not limit American Wire's reasonable expectation to only those projects; the email, combined with the allegation that American Wire communicated with Signal about all of the Three Projects, suffices at the pleading stage.

### 2. Knowledge

Next, WTEC argues that American Wire has failed to plausibly allege that WTEC knew about American Wire's expectation of future business with Signal. [Dkt. 53-1 at 11–12.] It notes, correctly, that the only allegation in the tortious interference section of the Second Amended Complaint is the conclusory allegations that WTEC "knew, or reasonably should have known, about these potential additional business opportunities between AWG and Signal," and it "was aware that AWG was expecting to enter into agreements with Signal, including agreements for the Three Projects." [Dkt. 52 ¶¶ 63, 67; *see* Dkt. 53-1 at 14.] In ruling on a motion to dismiss, however, the Court does not evaluate the plausibility of the complaint paragraph by paragraph; it must "read[ ] the allegations sensibly and as a whole." *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013). WTEC participated in discussions with Signal about the Sunflower Project. [Dkt. 52 ¶¶ 53–57.] Those discussions involved a separate project, but they help support an inference that WTEC knew that American Wire was actively in business with Signal. American Wire's allegation that Signal was going to split the business for the Three Projects between American Wire and WTEC bolsters that

7

inference. [*See* Dkt. 59 at 4.] Together, these allegations are sufficient to plausibly plead that WTEC knew about American Wire's business expectation.[2]

### 3. Improper Interference

Finally, WTEC argues that American Wire has not plausibly alleged that it intentionally and unjustifiably interfered with American Wire's business expectation. [Dkt. 53-1 at 8–11.] Succeeding on a tortious interference claim requires the plaintiff to allege "not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference'—that the defendant has committed some impropriety in doing so." *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998) (citations omitted). WTEC argues that the Second Amended Complaint "is devoid of any factual allegations of malicious or wrongful conduct by WTEC to intentionally interfere with Signal entering into a business relationship with AWG for The Three Projects" [Dkt. 53-1 at 9], and the additional facts American Wire adds in its response do not save its claim [Dkt. 60 at 3–9.][3]

---

[2] WTEC does not press its argument about knowledge in its reply brief [*see* Dkt. 60 at 3–9], and its opening brief's citation to *LoggerHead Tools, LLC v. Sears Holding Corp.*, 19 F. Supp. 3d 775 (N.D. Ill. 2013), does not support dismissal here. There, the plaintiff's dealings with the third party the defendant was alleged to have tortiously interfered with were "seemingly private," and the plaintiff merely alleged that the defendant could have known about the negotiations "from 'publicly available' facts." *Id.* at 784. Those allegations were insufficient to make it plausible that the defendant had knowledge of the plaintiff's business expectation (among other problems with the claim). *Id.* Here, by contrast, the dealings between American Wire, Signal, and WTEC were known to at least some extent to all three entities, and the other facts American Wire has alleged or will allege support WTEC's knowledge of American Wire's expectation of business with respect to the Three Projects.

[3] American Wire clarifies that it does not argue that WTEC's supplying the allegedly defective cables or refusing to indemnify American Wire constitutes tortious interference [Dkt. 59 at 12 n.5], so the Court does not address WTEC's arguments on this issue.

The Court cannot agree. WTEC is correct that the allegations in the tortious interference section are conclusory and do not, by themselves, sufficiently allege that WTEC acted with the purpose of interfering with American Wire's business, but the allegations as a whole support an inference of such conduct. *See Engel*, 710 F.3d at 710. This is what American Wire alleges unfolded:

- WTEC supplied American Wire with defective cable, which was used for projects including Signal's Sunflower Project. [Dkt. 52 ¶¶ 41–45.]
- American Wire sued, and the parties settled, agreeing that WTEC would indemnify American Wire vis-à-vis the Sunflower Project. [*Id.* ¶¶ 46–52.]
- After the issue with the defective cables came to light, Signal indicated that it was planning to issue purchase orders for cables from American Wire for two of the Three Projects. [Dkt. 59 at 3–4; Dkt. 59-1.]
- Signal tentatively decided to award a portion of the Three Projects to both American Wire and WTEC. [Dkt. 59 at 4.]
- Signal then changed course and contracted with WTEC alone for the Three Projects; American Wire had never before had Signal decline to proceed with a business arrangement at that stage, and WTEC was in contact with Signal about those projects at the time. [Dkt. 52 ¶ 69; Dkt. 59 at 4–5.]
- WTEC caused Signal to pull out of the prospective arrangement with American Wire by making "misrepresentations … regarding responsibility for the Signal Claim and Defective Cables." [Dkt. 52 ¶ 68.]
- WTEC also offered to sell Signal cables at a discounted rate "for purposes of harming AWG and not as part of normal competition." [Dkt. 59 at 5.][4]

Taking these allegations as true, as the Court must at this stage, an inference of improper inference by WTEC readily presents itself. Why, given that American Wire was not at fault for the defective cables at the Sunflower Project, would Signal stop working with it? If Signal had begun working with a company unconnected to the Sunflower Project, the possibility that it wanted to distance itself from the faulty

---

[4] American Wire alleges the facts in the last two bullet points essentially on information and belief. Doing so is appropriate here because the facts underlying this communication, if any, "are particularly in possession and control of [the] defendant.'" *Empire Indus. Inc. v. Winslyn Indus., LLC*, 2021 WL 214639, at *3 (N.D. Ill. Jan. 21, 2021) (quoting *Green v. Beth*, 663 F. App'x 471, 473 (7th Cir. 2016) (per curiam) (nonprecedential)).

cables altogether might have been an "obvious alternative explanation" that rendered a tortious interference claim implausible. *See Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019) (cleaned up). But Signal abandoned American Wire in favor of WTEC, which was at fault for the defective cables. In that context, American Wire's allegation that WTEC misrepresented to Signal who was responsible for the defective cables is certainly plausible.

WTEC argues that these allegations fail to rise to the level of "malicious or wrongful competition necessary to overcome the privilege of competition," which has been interpreted to mean "fraud, deceit, intimidation, or deliberate disparagement." [Dkt. 60 at 3–4 (cleaned up).] *See Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1995). The Court agrees with WTEC in part. Recall that American Wire alleges WTEC interfered with its business expectancy in two ways: by offering Signal discounted prices and by misrepresenting who was at fault for the Sunflower Project's defective cables. The former conduct cannot support a tortious interference claim (or help support one), but the latter can.

Competition for business is not actionable in a claim for tortious interference with business expectation "provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *See Soderlund*, 663 N.E.2d at 8 (citations omitted); *Talman Consultants, LLC v. Urevig*, 2023 WL 1451532, at *6 (N.D. Ill. Feb. 1, 2023) (explaining that the tort is not meant to "stifle healthy competition" in business, and "'impropriety' and 'purpose of injuring' set the bar high" for stating a claim). To satisfy the interference element, therefore, American Wire

10

must plead facts that make it plausible that WTEC acted with the requisite intent. Offering discounts, even atypical ones, is not the kind of fraudulent, deceitful, or otherwise wrongful conduct necessary under Illinois law, *see Soderlund*, 663 N.E.2d at 8, and American Wire cites no case recognizing that offering discounts can be tortious. True, American Wire alleges that WTEC offered Signal a discount "for purposes of harming AWG and not as part of normal competition," but it alleges no facts that make that allegation plausible [Dkt. 59 at 5], and the Court need not take such conclusory allegations as true. *See Bilek*, 8 F.4th at 856.

American Wire's allegation that WTEC misrepresented who was responsible for the defective cables on the Sunflower Project, however, is sufficient to support an inference of improper interference. WTEC invokes the competitor's privilege to argue that because American Wire and WTEC are competitors, American Wire must plead facts making it plausible that WTEC "has not employed a wrongful means or is not motivated solely by malice or ill will." [Dkt. 60 at 3–4 (quoting *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 399 (7th Cir. 2003)).] *See A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1405 (7th Cir. 1992) (explaining that the competitor's privilege permits a business to "act[ ] to advance its interests at the expense of its competitor" without engaging in tortious conduct). WTEC suggests that this burden requires alleging "more than mere misrepresentations or requests to discontinue business," noting that courts in the Seventh Circuit "have permitted claims for tortious interference with business relationship to proceed where the facts demonstrate some overt form of sabotage or threats." [*Id.* at 6–7; *see id.* at 7–8

11

(collecting cases where such conduct was alleged).] As WTEC sees it, American Wire's allegations "can be searched in vain for any allegation of unjustified or intentional interference even beginning to approach the kinds of facts" present in cases that survived the pleading stage. [*Id.* at 8.][5]

The Court disagrees. The allegations in the Second Amended Complaint, plus those added in the response brief, are sufficient. First, the Court does not see why a simple misrepresentation, if made with the intent to unjustly damage a competitor's business expectation, would not be actionable under Illinois law, and WTEC cites no case to support this notion. [*See id.* at 6]; Restatement (Second) of Torts § 767 cmt. c (Am. L. Inst. 1979) ("Fraudulent misrepresentations are also ordinarily a wrongful means of interference and make an interference improper."); *see also Dowd & Dowd*, 693 N.E.2d at 371 (citing the Restatement). Whether a misrepresentation was made with the intent necessary for liability is a question for a factfinder, not a conclusion the Court can draw at the motion to dismiss stage, when it must construe the allegations in the light most favorable to American Wire. *See Page*, 52 F.4th at 346.

Second, WTEC argues that its alleged misrepresentations about the Sunflower Project cables are not actionable:

> With regard to the Three Projects, AWG itself alleges that WTEC's misrepresentations were about WTEC's own responsibility for the Signal Claim and Defective Cables (a project unrelated to the Three Projects). Such an allegation not only fails to support AWG's tort claims, in a more basic way it makes no sense: WTEC's representations about

---

[5] Citing cases where claims were allowed to proceed is not particularly helpful because those cases do little to help draw the line between actionable and nonactionable conduct. In any event, when viewed in the light most favorable to American Wire, its allegations support an inference of intentional and unjustified interference with its business expectation.

12

> itself, by definition, do not relate to AWG and could therefore never be connected to some wrongful conduct aimed at AWG.

[Dkt. 60 at 8.] These arguments are unavailing. At this stage, the Court cannot rule out the possibility that misrepresentations about the Sunflower Project interfered with American Wire's business expectation with respect to the Three Projects. It is reasonable to infer that falsely telling Signal that American Wire was at fault for the defective cable on the Sunflower Project would cause Signal not to do business with American Wire on future projects. And even if WTEC is correct that American Wire at most alleges a misrepresentation about WTEC, it would make no difference. Suppose someone is hit from behind with a baseball, turns around, and sees two people. If one says, "I didn't throw the ball," the clear implication is that the other person did. So too here. American Wire alleges that WTEC's cable, which it provided to Signal, was defective. If WTEC told Signal that WTEC was not at fault for the defective cables, it is reasonable to infer that it meant that American Wire was. If that statement was false, it could be actionable. *Dowd & Dowd*, 693 N.E.2d at 371.

The existence of the competitor's privilege does not change the outcome at this stage. [*Contra* Dkt. 60 at 3–6.] Whether framed as an affirmative defense or an element of the plaintiff's claim, *see Cromeens*, 349 F.3d at 398–99 (discussing this issue), the competitor's privilege does not require dismissal. American Wire and WTEC are competitors, but falsely telling Signal that American Wire was responsible for the defective cables is not the kind of "healthy competition" that the privilege protects. *See Talman*, 2023 WL 1451532, at *6. American Wire's allegations that WTEC unjustifiably interfered with its business expectation are sufficient to state a

13

claim, so if the competitor's privilege comes into play, it will be at summary judgment or trial. [Dkt. 59 at 11–12.] *See Empire Indus.*, 2021 WL 214639, at *4–5 ("Fireclay has pleaded sufficient facts indicating that Empire used 'wrongful means to interfere,' which, if taken as true, make the competitor's privilege unavailable.").

\* \* \*

The Second Amended Complaint does not contain sufficient factual allegations to support Count VII, but American Wire's response to the motion to dismiss adds facts that, if alleged in a pleading, are sufficient to state a plausible claim that WTEC tortiously interfered with American Wire's expectation of future business with Signal. The Court will therefore grant the motion to dismiss Count VII but grant American Wire leave to replead this claim by adding the facts it alleged in its response brief.

B. **Count VIII: Remee**

Turning to American Wire's claim for tortious interference with its expectation of entering future business with Remee, WTEC argues that American Wire failed to state a claim. [Dkt. 53-1 at 13–15; Dkt. 60 at 8–9.] The Court agrees. American Wire's allegations, even when supplemented by the additional facts included in its response brief, fail to plausible allege improper interference with American Wire's prospective business with Remee. *See Dowd & Dowd*, 693 N.E.2d at 371.[6]

WTEC is correct that American Wire's allegations in connection with this claim are too conclusory. [*See* Dkt. 60 at 8–9.] Those allegations are:

---

[6] Because the Court agrees with WTEC regarding the intentional interference element, it does not consider its argument that American Wire failed to allege an expectation of future business. [*See* Dkt. 53-1 at 12–13.]

14

- American Wire had a longstanding business relationship with Remee, a supplier. [Dkt. 52 ¶ 71.]
- Remee informed American Wire that, at the request of WTEC, it would no longer do business with American Wire. [*Id.* ¶¶ 72–73.]
- This request came during the pendency of this litigation. [Dkt. 59 at 1.]
- Remee's president and CEO said that this was the first time in 50 years he had made a similar call. [*Id.* at 5.]
- Remee's president said that he was aware of the litigation between American Wire and WTEC and was apologetic to American Wire, but "Remee did a substantial amount of business with WTEC." [*Id.* at 5.]

American Wire argues that a reasonable inference from these allegations is "that WTEC acted through wrongful means or was motivated by malice in contacting Remee during this lawsuit and requesting Remee to discontinue business with AWG." [*Id.* at 15.] These allegations are certainly consistent with WTEC acting with malice toward AWG, but the federal pleading standard demands more. *See, e.g.*, *Russell v. Zimmer, Inc.*, 82 F.4th 564, 571 (7th Cir. 2023) (explaining that the allegations must "nudge [its] claims across the line from conceivable to plausible" (cleaned up)); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 580 (7th Cir. 2022) (affirming dismissal where the "complaint simply d[id] not provide the kind of context that could move th[e] claim from possibility to plausibility" (cleaned up)).

American Wire attempts to save this claim by arguing that if the conduct at issue was "motivated by malice, not simply economic self-interest," it can prevail. [Dkt. 59 at 15 (quoting *Allstate Ins. Co. v. Ameriprise Fin. Servs. Inc.*, 2023 WL 5334638, at *36 (N.D. Ill. Aug. 18, 2023)).] This quotation subtly shifts the pleading burden, however, because the Seventh Circuit case *Allstate* cited—and the Illinois authority the Seventh Circuit relied on—included the word "solely." *See Cromeens*, 349 F.3d at 399 ("A defendant is entitled to the protection of the privilege of

15

competition provided that the defendant has not employed a wrongful means or is not motivated solely by malice or ill will." (citing *Soderlund*, 663 N.E.2d at 8)).

Given that WTEC did business with Remee, the allegation that WTEC asked Remee to stop doing business with American Wire does not support a reasonable inference that WTEC was motivated solely by malice or that it used improper means, such as threats or intimidation, to persuade Remee to stop doing business with American Wire. There is an "obvious alternative explanation"—that WTEC was motivated, at least in part, by its own economic self-interest—which means that American Wire's allegations fail to rise to the level of plausibility. *See Alarm Detection Sys.*, 930 F.3d at 821; *Russell*, 82 F.4th at 571; *Talman*, 2023 WL 1451532, at *6 ("While Talman alleges willful and malicious acts, this allegation is legal and, thus, insufficient without supporting facts."); *see also, e.g., United Road Towing, Inc. v. IncidentClear LLC*, 2015 WL 1598101, at *3 (N.D. Ill. Apr. 9, 2015) (holding that threats to cease doing business with and to file a lawsuit against a third party constituted improper interference).[7]

A defendant's malicious or threatening attempt to cause a third party to stop doing business with a plaintiff constitutes tortious interference with a prospective economic advantage. *See Anderson*, 667 N.E.2d at 1299; *Dowd & Dowd*, 693 N.E.2d at 371. But Count VIII does not plausibly allege that WTEC's request that Remee stop doing business with American Wire was malicious or done through improper

---

[7] Nor can American Wire rely on the general principle that the competitor's privilege is not an issue for the pleading stage because, unlike in *Empire Industries*, 2021 WL 214639, at *5, American Wire has not plausibly alleged wrongful conduct. [*Contra* Dkt. 59 at 11–12.]

16

means. Because the facts it proposes to add to the Second Amended Complaint are insufficient to save this claim, the Court will dismiss it with prejudice.

## IV. Conclusion

For the foregoing reasons, WTEC's motion to dismiss [Dkt. 53] is granted. Count VII is dismissed without prejudice; Count VIII is dismissed with prejudice. By May 17, 2024, American Wire may file a third amended complaint that repleads Count VII by adding the allegations contained in its response brief.

Enter: 23-cv-4678
Date: May 4, 2024

_____
Lindsay C. Jenkins
United States District Judge