UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

American Wire Group, LLC,

     *Plaintiff,*

v.

WTEC Holdings Corp. d/b/a WTEC Energy,

     *Defendant.*

No. 23 CV 4678

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Amid an earlier lawsuit, Wind Turbines and Energy Cables Corporation ("WTEC") agreed to indemnify American Wire Group, LLC ("American Wire" or "AWG") against certain claims relating to defective electric cables. Soon after, American Wire settled with one of its customers, Signal Energy, LLC ("Signal"), for $2.5 million when faulty cables caused a ground fault at a Signal project site. When WTEC challenged its indemnity obligations, American Wire filed this lawsuit for breaches of contract and warranties. Before the court are cross-motions for summary judgment and American Wire's motion to dismiss its own claim for a declaratory judgment. For the following reasons, American Wire's motion for summary judgment is denied, while WTEC's motion is granted in part and denied in part. The motion to dismiss the declaratory judgment claim is also granted, and American Wire is given leave to file an amended complaint that omits that claim.

## I.   Background

The following undisputed facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits.[1] [Dkts. 98, 110, 116.][2]

American Wire is a Florida-based company that supplies electric wire and cable for commercial and industrial use. [Dkt. 98 ¶ 5.] It does not itself manufacture

---

[1] "On summary judgment, the court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires the moving party to file a statement of material facts with citations to specific supporting evidence in the record. L.R. 56.1(a)(2); *see also* L.R. 56.1(d). The opposing party must then respond to each fact by either admitting it or disputing it with its own supporting evidence. L.R. 56.1(b)(2); *see also* L.R. 56.1(e). The non-moving party may also file additional facts supporting its position. L.R. 56.1(b)(3).

[2] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

either, but instead contracts with manufacturers to purchase cable and wiring, which it then supplies to customers. [*Id.* ¶ 7.]

Around June 2021, several customers notified American Wire that their cables were cracking or splitting. [*Id.* ¶ 11.] WTEC, a New Jersey-based manufacturer with whom American Wire contracts, manufactured the allegedly defective cable (Red PV Cable). [*Id.* ¶¶ 11, 13.] For this, American Wire sued WTEC in January 2022 (the "Prior Lawsuit"), and the parties settled in March 2023. [*Id.* ¶¶ 12, 59.]

While the Prior Lawsuit was pending, American Wire became aware in July 2022 that a different customer, Signal, was experiencing ground fault issues caused by "defective low voltage cables" at a Mississippi construction site. [*Id.* ¶ 26.] Sunflower County Solar Project, LLC ("Project Owner") hired Signal to engineer, procure, and construct its Sunflower Solar Project (the "Sunflower Project"), and it contracted American Wire to supply the necessary cables. [*Id.* ¶¶ 17–18.] In total, WTEC manufactured about 18.5 percent of the 155,058 linear feet of Red PV Cable that American Wire supplied to Signal. [Dkt. 98 ¶ 25.] Two or three other companies manufactured the rest.[3] [*Id.* ¶ 20; Dkt. 110 ¶ 16.] All cables passed testing at installation, and subcontractor E. Light Electrical Services ("E. Light") identified no insulation issues or defects at the time. [Dkt 110. ¶ 20.]

In their investigation into the ground fault issues, Signal and E. Light observed that the faulty cables "had a distinctive pink color of exterior insulation in contrast to a true red color of exterior insulation on other low voltage cables installed at the Sunflower Project." [Dkt. 102-7 ¶ 9; Dkt. 90-19 at 3 ("cable has more of a pink hue than a red").] Signal communicated the problems to American Wire, who acknowledged being "aware of this defect" and shared that WTEC cables were identifiable by their "pinkish hue." [Dkt. 110 ¶ 28.] American Wire also noted that WTEC cables had a numeric date stamp and were not marked "AWG Polycab." [*Id.*]

In September, American Wire's attorneys contacted WTEC—and only WTEC—demanding indemnification. [Dkt. 110 ¶¶ 29–31.] The letter stated that "WTEC shipped the Cable directly to the Sunflower Project and, therefore, there can be no dispute that WTEC's Cables, rather than some other manufacturer's cable, are the defective wiring at issue." [Dkt. 102-21.] Signal, however, did not keep records showing where it installed each brand of reels. [Dkt. 110 ¶¶ 38–39.]

WTEC responded, stating a belief that its cable was not defective, asking American Wire to "refrain from altering or destroying any of the cable at issue," and requesting samples of the cable. [Dkt. 102-22.] It also "strongly urge[d] AWG not to engage in self-help by resolving claims from Signal without WTEC's direct

---

[3]    The parties dispute whether Hebie Huatong Wire & Cable Group Co., Ltd. and Imperium, who are affiliates, count as one or two manufacturers. [Dkt. 96 ¶ 20; Dkt. 110 ¶ 16.]

involvement." [*Id.*] But American Wire neither provided WTEC samples, nor did it take steps to preserve the cables. [Dkt. 110 ¶ 33.] Further, American Wire instructed Signal not to communicate with WTEC, and its attorney advised WTEC that:

> WTEC interacting directly with Signal regarding the Project is completely inappropriate. WTEC has no contract with Signal for the supply of cable to the Project. It is AWG who has that contract with Signal, and AWG will do whatever is in the best interest for AWG's business relationship with its customer. WTEC has no right whatsoever to step into AWG's contractual relationship with Signal and interfere with Signal's (and AWG's) efforts to remediate the defective cable at the Project.

[*Id.* ¶ 44.] WTEC had previously spoken with Signal, whose vice president of procurement said on October 11 that he was open to transferring contractual warranties to WTEC but foresaw issues distinguishing cables among manufacturers. [*Id.* ¶¶ 40–41.]

On October 6, American Wire representatives visited the site for the first time. [*Id.* ¶ 34.] There, they compared the defective cable with a "sample of the 'bad cable' at issue in the still ongoing Prior Lawsuit." [*Id.* ¶ 35.] American Wire's John Ciscato provided the following summary:

> I brought a sample of bad WTEC cable that I had from the Athos site. Without mentioning anything, one of the E-Light guys proclaimed, "that looks exactly like the cable that has been failing here, I can tell by the color and texture". It seems very clear by the investigation report that they have identified WTEC cable as pink and Polycab as red. The eye test by myself and Isaac was also able to see the color difference in cable.

[*Id.*] Project Owner decided to replace rather than repair the defective cables, and Signal agreed. [Dkt. 98 ¶ 48.] They ultimately replaced all WTEC cable, identifying it based on its physical characteristics. [*Id.* ¶ 56; Dkt. 102-29 at 3.] According to Signal, "[a]ll cable replaced was deemed defective" [Dkt. 102-29 at 2], though American Wire's purchase order with Signal contained a 'serial defect' clause, permitting replacement of all cable—notwithstanding any sign of defect—if more than 15 percent was defective.[4] [Dkt. 110 ¶ 10.]

---

[4]     The clause provides that "in the circumstances where more than fifteen percent (15%) of the total number or capacity of the goods furnished by SUPPLIER as part of this Purchase Order (or component thereof) is Defective then SUPPLIER shall (1) perform or cause to be performed a root- cause analysis with respect thereto within four (4) Business Days of when SUPPLIER becomes aware or should have become aware of such Serial Defect; and (2) promptly correct, repair or replace the goods in their entirety and shall be liable for all costs necessary to uninstall the Defective goods and install the replacement goods regardless of whether such goods (or component thereof) has exhibited the Defect." [Dkt. 110 ¶ 10.]

On October 25, Signal sent American Wire a formal warranty claim. [*Id.* ¶ 53.] Soon after, American Wire sent its first shipment of replacement cable. [*Id.* ¶ 54.] It delivered additional shipments in November, January, and March. [*Id.* ¶¶ 54–55.] Throughout, American Wire and Signal held monthly update calls, without WTEC, to discuss remediation status and costs.  [*Id.* ¶¶ 51–52.]

On March 2, 2023, American Wire and WTEC settled the Prior Lawsuit. [Dkt. 98 ¶ 59.] The settlement agreement contained the following indemnification clause (the "Indemnification Clause") pertaining to the Sunflower Project:

> Indemnity For Anticipated Sunflower Claim. In the event Signal, or any other person or entity, asserts a claim against AWG regarding or relating to the Cables supplied to the Sunflower site (any such claim, a "Sunflower Claim"), AWG and WTEC will work together and cooperate in good faith to resolve any such claim. WTEC agrees to indemnity, defend, and hold harmless AWG, its past or present officers, directors, shareholders, employees, attorneys, sureties, divisions, affiliates, parent or subsidiary companies, assigns, or successors in interest from and against any claims, damages or losses actually incurred by Signal or any other person or entity relating to the provision, supply, installation, performance, and/or replacement of the Cables at the Sunflower site, including reasonable attorneys' fees, except to the extent such claims, damages and losses are attributable to the negligence or willful misconduct of the indemnified party. WTEC agrees to indemnify and hold harmless AWG for any and all costs, expenses, and/or credits that AWG incurs to negotiate, resolve, and/or settle any Sunflower Claim. WTEC must respond to any demand from AWG for indemnity or defense pursuant to this provision within seven (7) calendar days of receiving AWG's demand.

[*Id.* ¶¶ 59–60.]

In April, Signal sent American Wire its remediation costs through February 2023, totaling nearly $1 million. [Dkt 110 ¶ 56.] It also advised American Wire that three months' work remained. [*Id.* ¶ 57.] American Wire then notified WTEC to "request a discussion concerning how WTEC would like to handle Signal's claim," which it anticipated would result in "upwards of $2,000,000 in liability." [Dkt. 90 ¶ 28.] The letter did not mention costs to date or the anticipated time remaining. [Dkt. 110 ¶ 58.]

In May, American Wire forwarded WTEC a spreadsheet of remediation costs for the month of March totaling more than $1 million, but it did not note its discussion with Signal that "the total 'backcharge' for the project was close to $2 million." [*Id.* ¶ 60.] WTEC also requested additional information, an inspection, and samples "to confirm that the faulty cable belonged to WTEC." [*Id.* ¶ 61.] American Wire provided

written responses but did not relay that Signal "discarded defective AWG/WTEC cable removed from trenches if a new parallel trench was not utilized. These cables were identified based on initial inspections of all cables." [*Id.* ¶¶ 61–62.]

Communications continued. A May 31 email that American Wire forwarded to WTEC identified costs through April as totaling $2,768,341.10. [*Id.* ¶ 63.] During an early June conference call, American Wire, WTEC, and Signal discussed the work and logistics for a site visit by WTEC, which occurred in late June. [*Id.* ¶ 65.]

On June 28, Signal made its first formal demand of American Wire, requesting immediate payment of nearly $2.5 million—with more to come. [Dkt. 90-29.] The following day, American Wire sent WTEC a formal demand for indemnity, which WTEC denied. [Dkt. 98 ¶ 70.] Specifically, WTEC maintained that American Wire was the "demonstrable cause" of the $2.5 million, and that it obstructed mitigation efforts in violation of the settlement agreement. [Dkt. 110 ¶ 72.] WTEC also stated that it doesn't "deny that it manufactured at least some, if not much or even substantially all, of the photovoltaic cable that appears to be the subject of the AWG's demand (though it denies that all such cable was defective or irreparable)." [Dkt. 90-31 at 2.] This lawsuit followed.

By October, Signal had shared with American Wire a final bill totaling nearly $4.5 million. [Dkt. 98 ¶ 71.] American Wire challenged the magnitude of costs, noting it was inconsistent with the amount of material delivered to the site. [Dkt. 102-45.] American Wire ultimately settled the dispute with Signal for $2.5 million. [Dkt. 98 ¶ 74.]

## II. Analysis

### A. Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). When reviewing cross-motions for summary judgment, the court views the facts and "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Med. Protective Co. of Fort Wayne, Indiana v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). Defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

### 1. Breach of Contract (Indemnification Clause)

The parties filed cross-motions for summary judgment on Count II, American Wire's claim that WTEC breached the Indemnification Clause. To succeed, American Wire must prove "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff"—all based on the undisputed facts. *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 522 (7th Cir. 2022) (quoting *Henderson-Smith & Assocs., Inc. v. Nahamani Fam. Serv. Ctr. Inc.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001)). WTEC, meanwhile, must demonstrate that no reasonable jury could find American Wire capable of proving one or more of these elements.

Despite WTEC's arguments to the contrary, unresolved questions of fact prevent the court from deciding: (1) whether American Wire fulfilled its performance obligation to work with WTEC and cooperate in good faith; (2) whether American Wire properly exercised its discretion in directing Signal to replace WTEC's cables; and (3) whether the $2.5 million in breach of contract damages were foreseeable.

### a. Lack of Cooperation

The Indemnification Clause provides that, in the event of a Sunflower Claim, "AWG and WTEC will work together and cooperate in good faith to resolve any such claim." [Dkt. 98 ¶ 60.] The parties first disagree about whether the cooperation clause establishes a condition precedent. Regardless, American Wire argues that it satisfied its performance obligations and, in any event, that WTEC failed to prove it was substantially prejudiced by any lack of cooperation. [Dkt. 109 at 3–4.]

Citing *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992), American Wire contends that, under Illinois law, "[t]he duty of good faith is not an independent source of contractual duties, but rather guides the construction of an agreement's explicit terms." [Dkt. 109 at 3.] *Beraha*, however, discusses the *implied* covenant of good faith and fair dealing. Here, good faith cooperation is itself an explicit term. Because ordinary principles of contract law apply to indemnification clauses, and because the court is therefore obligated to give effect to every provision, it follows that a good faith cooperation clause confers affirmative obligations on both parties. *See Walgreen Co. v. Panasonic Healthcare Corp. of N. Am.*, 2017 WL 6731973, at *4 (N.D. Ill. Dec. 29, 2017).

WTEC observes that, "[i]n the insurance context, an agreement to 'cooperate' is often viewed as a condition precedent to coverage." [Dkt. 101 at 9.] There, the "insured's duty to cooperate arises from the fact that the insurer usually 'has little or no knowledge of the facts surrounding a claimed loss, while the insured has exclusive knowledge of such facts,' resulting in the insurer being 'dependent on its insured for fair and complete disclosure.'" *McGraw Prop. Sols. LLC v. Westchester Surplus Lines Ins. Co.*, 2024 WL 1702680, at *3 (N.D. Ill. Apr. 19, 2024) (quoting *Piser v. State Farm*

*Mut. Auto. Ins. Co.*, 938 N.E.2d 640, 647 (Ill. App. Ct. 2010). This, the Illinois Supreme Court has said, also applies "'in the context of indemnification,' [since] the insurer should not be 'relegated to a less secure position' with respect to information when it does not defend but merely has the duty to indemnify." *LaSalle Nat. Tr., N.A. v. Schaffner*, 1993 WL 105422, at *4 (N.D. Ill. Apr. 6, 1993) (quoting *Waste Management, Inc. v. International Surplus Lines Ins. Co.*, 579 N.E.2d 322, 332–33 (Ill. 1991).

Having agreed to indemnify American Wire against certain claims, WTEC is similarly dependent on American Wire for fair and complete disclosure. This is especially true given American Wire's insistence that WTEC not communicate directly with Signal. [Dkt. 110 ¶ 44.] Therefore, as between an insurer and the insured, the affirmative obligations conferred by American Wire and WTEC's cooperation clause establish "a contractual condition precedent to suit." *McGraw*, 2024 WL 1702680, at *4.

"Whether a[ party] breached a policy's cooperation clause is typically a question of fact, but [the movant] is entitled to summary judgment where the [party] makes 'virtually no effort to produce relevant information.'" *Id.* (quoting *Hartshorn v. State Farm Ins. Co.*, 838 N.E.2d 211, 214–15 (Ill. App. Ct. 2005)). Put another way— and to borrow WTEC's own language—summary judgment is appropriate if "AWG did *nothing*." [Dkt. 101 at 11 (emphasis in original).]

The undisputed facts here, however, do not show that American Wire did nothing. WTEC argues that "AWG excluded WTEC from communications with Signal, affirmatively obstructed WTEC's involvement in relevant conversations and decisions regarding replacement, and during that period Signal continued to incur millions of dollars in damages." [*Id.*] American Wire, meanwhile, argues that it "shared costs and other information… [and] coordinated a conference call among representatives of AWG, WTEC and Signal to discuss Signal's costs, the logistics of a site visit by WTEC and the work performed by Signal." [Dkt. 109 at 4.] And an April email from American Wire to WTEC "request[ed] a discussion concerning how WTEC would like to handle Signal's claim." [Dkt. 90-28.]

A reasonable jury could well conclude from these events that, on balance, American Wire's actions do not amount to good faith cooperation. But that remains an open question of fact. Unlike in *McGraw*, where the plaintiff failed to produce any requested documentation or appear for an examination under oath, the record simply doesn't support WTEC's contention that American Wire did *nothing*. 2024 WL 1702680, at *4. *See also Piser*, 938 N.E.2d at 649 (holding that plaintiff's efforts to cooperate were "negligible" and warrant summary judgment when "(1) plaintiff failed to sign a financial authorization allowing [defendant] to check his credit; (2) plaintiff failed to submit to an examination under oath; and (3) plaintiff failed to provide all the requested tax returns, bank records, and other financial documentation").

7

American Wire also argues that WTEC did not demonstrate "substantial prejudice" from the alleged lack of cooperation, thereby rendering any question of fact moot. [Dkt. 109 at 3.] This, too, borrows from the insurance context, with an underlying rationale being that, if a "prime objective of the cooperation clause is to … enable the insurer to prepare its defense," that defense must actually be hampered. *M.F.A. Mut. Ins. Co. v. Cheek*, 363 N.E.2d 809, 813 (Ill. 1977). It follows here that, if cooperation is necessary for fair disclosure, any failure to do so must worsen WTEC's position.

WTEC has met its burden by arguing—and supporting its argument with evidence—that American Wire "lacked necessary information to evaluate its indemnification obligations." [Dkt. 115 at 4–5.] For example, if it is true that American Wire prevented WTEC from "inspect[ing] the cable and confirm[ing] that the at-issue cable was its own," WTEC can demonstrate substantial prejudice. [Dkt. 96 at 7.]

WTEC is therefore correct that, if American Wire failed to cooperate in good faith, WTEC need not indemnify against Signal's claim. Whether American Wire did cooperate in good faith, however, is an open question of fact that cannot be resolved at summary judgment.

## b. Underlying Liability

"A defendant who has breached a contract is liable only for the damages that the breach caused." *In re: Emerald Casino, Inc.*, 867 F.3d 743, 755 (7th Cir. 2017) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 832 (Ill. 2005)). WTEC argues it could not have breached the Indemnification Clause because nobody conclusively determined "whether *all* (or even what portion)" of its cable was detective. [Dkt. 101 at 12 (emphasis in original).] Instead, it was the serial defect provision in American Wire's contract with Signal, rather than WTEC-manufactured cables, that caused American Wire's damages. [*Id.*]

Not so. The breach, as alleged, is not the defective cables; it's WTEC's failure to indemnify American Wire "for costs to 'negotiate, resolve, or settle' any 'Sunflower Claim,'" which, as WTEC acknowledges, are claims against American Wire "stemming from the provision of [WTEC's] 'Cables' to the Sunflower site." [Dkt. 96 at 3, 8.] WTEC erroneously conflates these things when arguing that American Wire must show that "WTEC's 'Cables' were actually [the] source of Signal's 'Sunflower Claim,'" and that it cannot "because the record is completely devoid of any evidence that all of WTEC's cables were defective." [*Id.* at 9.] WTEC's obligations arise from the claim, not any underlying liability—and the claim need only "regard[] or relat[e] to the Cables supplied to the Sunflower site." [Dkt. 98 ¶ 60.]

8

The law is clear on this point. When the clause's plain language says so, "it is the *claim* … not the existence of any actual liability on [the indemnifier's] part, that triggers those rights and responsibilities." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 793 (7th Cir. 2014) (emphasis in original) (applying Illinois law and noting that "there is nothing substantively unconscionable, or even unusual, about an indemnity agreement that operates in this way"). *See also Lamp, Inc. v. Int'l Fid. Ins. Co.*, 493 N.E.2d 146, 149 (Ill. App. Ct. 1986) ("right to indemnification arose immediately upon [plaintiff's] claim regardless of defendant's liability on the underlying claim").

Here, WTEC doesn't "deny that it manufactured at least some, if not much or even substantially all, of the photovoltaic cable that appears to be the subject of the AWG's demand"—only that "such cable was defective or irreparable." [Dkt. 90-31 at 2. *See also* Dkt. 98 ¶ 56 ("WTEC does not dispute that Signal identified WTEC's cable based upon the physical description provided by AWG and then replaced all cable which it identified as belonging to WTEC.")] Thus, as in *Hanover*, "[t]here can be no genuine dispute that claims were made," and that they were the claims contemplated by the Indemnification Clause. 751 F.3d at 793.

Even so, the timeline of events leading up to the claim is as follows: Signal experienced a ground fault, investigated, and found that the defective cables were more pink than red. [Dkt. 98 ¶ 32.] American Wire identified the cables as WTEC's and provided criteria to determine which cables to replace. [*Id.* ¶ 35; Dkt. 110 ¶ 66.] And Signal, having decided to replace rather than repair, "replaced all of the cable identifiable as being WTEC 750 Red PV Cable" and issued a claim. [Dkt. 98 ¶ 56.]

Given this chronology, the court understands WTEC's inclination to press the liability question. It cannot be that, if vested with discretion to determine which cables should be replaced, American Wire could dictate replacement of WTEC's cables without reason—*i.e.*, manufacture its own Sunflower Claim.

In Illinois, "the implied covenant of good faith and fair dealing requires a party vested with discretion to exercise that discretion reasonably, with proper motive and in a manner *consistent with the reasonable expectations of the parties.*" *Beraha*, 956 F.2d at 1444 (citing *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 972 (Ill. 1984)) (emphasis in original). Here, that discretion is circumstantial rather than contractual, but the underlying need to limit it is no different.

The question of good faith is one for the trier of fact, particularly when there are no contractual standards to otherwise curb a party's discretion. *See Ragan v. BP Prods. N. Am., Inc.*, 2019 WL 6309927, at *12, n.2 (N.D. Ill. Nov. 25, 2019). Indeed, there is evidence in the record that would permit a jury to arrive at either conclusion. A reasonable jury might credit Signal's finding that the defective cables were pink, which American Wire believed from the Prior Lawsuit connected them to WTEC. Or it might acknowledge a possible contradiction: Signal didn't keep records as to where

it installed each brand of reels, *see* dkt. 110 ¶¶ 38–39, yet American Wire's first demand letter stated that "WTEC shipped the Cable directly to the Sunflower Project and, therefore, there can be no dispute that WTEC's Cables, rather than some other manufacturer's cable, are the defective wiring at issue." [Dkt. 102-21.]

So, while WTEC's indemnity obligations do not depend on American Wire proving underlying liability, it must still show it acted in good faith in dictating the circumstances and scope of Signal's replacement effort (and thereby triggering a Sunflower Claim). This, too, cannot be resolved at summary judgment.

### c.     Foreseeability of Damages

Relatedly, WTEC argues that, because of the serial defect provision, the reach of "AWG's settlement with Signal was not contemplated by *both* parties at the time of the settlement agreement." [Dkt. 101 at 12–13 (emphasis in original).] But this, too, relies on a fundamental misunderstanding of the breach itself.

"Under Illinois law, 'all damages which naturally and generally result from a breach are recoverable; it is only where damages are the consequence of special or unusual circumstances that it must be shown that the damages were within the reasonable contemplation of the parties.'" *In re: Emerald Casino, Inc.*, 867 F.3d at 757–58 (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp*, 515 N.E.2d 61, 67 (Ill. 1987)).

Count II alleges that WTEC breached by failing to indemnify against the (settled) claim, not by supplying faulty wires. American Wire's losses for having itself covered the full settlement, then, arise naturally and generally from that breach. The serial defect is therefore irrelevant to this question,[5] and the damages are neither special nor unusual. Foreseeability concerns do not entitle WTEC to summary judgment, either.

***

Therefore, WTEC is not entitled to summary judgment for Count II. And because American Wire's good faith cooperation and exercise of discretion remain open questions of fact, its own motion for summary judgment is also denied.

### 2.     Breach of Contract (Purchase Order) and Warranties

American Wire raises alternative claims for breach of its purchase order with WTEC (Count III), breach of express warranty (Count IV), breach of the implied

---

[5]     Regardless, Signal shared with WTEC that "[a]ll cable replaced was deemed defective," and so there is at least an open question as to whether the serial defect provision was even triggered. [Dkt. 102-29 at 2.]

warranty of merchantability (Count V), and breach of the implied warranty of fitness for a particular purpose (Count VI). WTEC has moved for summary judgment on these counts, too.

### a. Breach of the Purchase Order

American Wire alleges that the Purchase Order with WTEC "constitutes a valid and enforceable contract," which WTEC breached by "manufacturing Cable that was defective and not in compliance with industry standards, including but not limited to the UL 4703 and UL 44 standards." [Dkt. 66 ¶¶ 94–95.] WTEC argues that the claim is a factual duplicate of the breach of American Wire's express warranty claim, *see infra* Part II.A.2.b, and should be dismissed. [Dkt. 101 at 13–14.] The court agrees.

American Wire acknowledges some overlap but insists the claims are distinguishable, such that the contract claim "arises from the generally defective nature of the cables and is not solely limited to the cables' noncompliance with UL standards." [Dkt. 109 at 7.] But the Purchase Order is silent as to standards for analyzing defect, except insofar as the to-be-sold cables have descriptors, such as:

> PRINT LEGENDS-750 MCM "AMERICAN WIRE GROUP SUNGUARD(R) 750 MCM AA8000 AL CDR 135 MILS XLPE 2000V TYPE PV WIRE OR RHH OR RHW-2 OR USE-2 600V 90C WET OR DRY IEEE 1202 SUN RES DIR BUR -40C (UL) LISTED E361222 [MONTH/YEAR] [SEQUENTIAL FT MARKING]"

[Dkt. 102-19 at 2.] But these descriptors are the very markings upon which the express warranty claim rests. [*See* Dkt. 66-2 at 2 ("Cables shall be identified by means of surface print of white color. Sequential footage markers can be added upon request. A typical print legend is given below: WTEC E#474007 AWG ( MM²) AL (UL) PV WIRE 2000V 90°C DRY OR WET (-40°C) XLPE SUN RES DIRECT BURIAL RHH/RHW-2 2000V ROHS").]

WTEC, then, cannot breach the Purchase Order without also breaching the express warranties contained therein.[6] Summary judgment is therefore granted to "further clarify and narrow the relevant issues for trial and avoid jury confusion." *Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 983 (E.D. Wis. 1999), aff'd, 241 F.3d 915 (7th Cir. 2001). *See also Ellengee Mkt. Co. v. Phenix Specialty Films, LLC*, 556 F. Supp. 3d 874, 889 (N.D. Ill. 2021) (dismissing contract claim as duplicative of warranty claim because plaintiff "cannot recover twice by making the same claim in two counts. Keeping them both would accomplish nothing, except confusing the jury.")

---

[6]     That is, unless the alleged breach concerned something other than defective goods, i.e. a failure to deliver on time or the correct quantity. But it does not.

### b. Breach of Express Warranty

To prevail on its breach of express warranty claim, American Wire must prove that WTEC "(1) made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis for the bargain; and (4) guaranteed that the goods would conform to the affirmation or promise." *Palmer v. Procter & Gamble Co.*, 2023 WL 5852252, at *8 (N.D. Ill. Sept. 11, 2023) (internal quotations and citation omitted).

In its complaint, American Wire contends that "[b]y placing a UL Mark and other [surface] markings on its Cable, WTEC made an affirmation of fact and/or a promise that the Cable would conform with UL standards and other industry standards, including but not limited to the UL 4703 and UL 44 standards." [Dkt. 66 ¶ 101.] In its response brief, though, it re-casts the claim as predicated on affirmations in "product literature concerning the physical characteristics of the cable at issue." [Dkt. 109 at 8.] WTEC's arguments in support of summary judgment are three-fold: (1) that the "self-contradictory shift in theory" should be disregarded; (2) that UL, not WTEC, makes certification decisions; and (3) that, in any event, American Wire cannot prove nonconformity. [Dkt. 101 at 14–15; Dkt. 115 at 11–13.] None are persuasive.

First, the court disagrees that it should disregard American Wire's statement of reliance on the Product Data Sheet. WTEC does not dispute that American Wire purchased cables on February 5, 2021, just days after receiving the Data Sheet on February 1. [Dkt. 98 ¶ 8; Dkt. 116 ¶ 3.] "[A]ffirmations of fact made during a bargaining process regarding the sale of goods are presumed to be part of the basis of the bargain unless clear affirmative proof to the contrary is shown." *Felley v. Singleton*, 705 N.E.2d 930, 934 (Ill. App. Ct. 1999).

Meanwhile, the supposed "shift in theory" is not clearly "self-contradictory." The Data Sheet references industry standards and surface markings consistent with the complaint's allegations. [*See* Dkt. 66-2 (discussing industry certifications).] According to American Wire's brief, the Data Sheet also "promises that the cables' insulation would be cross-linked polyethylene and that the cable is sunlight resistant and suitable for direct burial." [Dkt. 109 at 8.] The surface markings promise this, too. [Dkt. 66-2 at 2 (noting that a "typical" surface marking includes "XLPE SUN RES DIRECT BURIAL").] In other words, because the Data Sheet and surface markings make the same promises, allegations of inconsistency fall short at this posture. The more reasonable inference is that, where the complaint states that "[t]hese markings, and the compliance with industry standards that the markings represented, formed part of the basis of AWG's bargain," it is referring to mention of these markings in the Data Sheet, which—unlike the cables themselves—American Wire received pre-purchase. [Dkt. 66 ¶ 102.] Put differently, the brief may simply clarify the complaint.

Second, because the markings communicate more than just UL compliance—*i.e.*, they specify temperatures and conditions under which the cables will function—

WTEC's arguments regarding third-party certification are not dispositive. These other specifications are affirmations of fact, too. Regardless, while WTEC correctly notes that other courts have held, in a 'false advertising' context, that a UL Mark communicates authorization, not compliance, *see, e.g., Bd.-Tech Elec. Co. v. Eaton Elec. Holdings LLC*, 2017 WL 4990659, at *6 (S.D.N.Y. Oct. 31, 2017), *aff'd sub nom. Bd.-Tech Elec. Co. v. Eaton Corp.*, 737 F. App'x 556 (2d Cir. 2018), the Data Sheet *explicitly* states that "cables produced under this specification will comply with all applicable requirements of the following standards." [Dkt. 66-2 at 2.] Under Illinois law, express warranties must be "interpreted in a manner that is consistent with the clear and express language contained therein." *Hasek v. DaimlerChrysler Corp.*, 745 N.E.2d 627, 636 (Ill. App. 2001). For that reason, a jury could find that WTEC warranted not just authorization, but compliance, too.

Third, while WTEC argues that "the total lack of evidence in the record to demonstrate a breach ultimately decimates [American Wire's] claims," there is sufficient circumstantial evidence to create a question of fact. [Dkt. 115 at 13.] This includes Signal's determination that defective wires caused its ground fault, its investigation's finding that the faulty cables "had a distinctive pink color," and supposed recognition by its subcontractor that WTEC's cables "'look[] exactly like the cable that has been failing here.'" [Dkt. 98 ¶ 26; Dkt. 102-7 ¶ 9; Dkt. 110 ¶ 35.] To be sure, American Wire will have to prove WTEC's underlying liability here. And to the extent any of its claimed damages follow from a serial defect provision, as opposed to defective cables, they must be foreseeable.[7] *See KC Rental, LLC v. WMK Auto. Inc.*, 2025 WL 1807882, at *3 (N.D. Ill. July 1, 2025). But those matters cannot be resolved at this juncture, and so summary judgment on this alternative claim is denied.

### c. Breach of the Implied Warranty of Merchantability

"To prevail on a claim for breach of implied warranty of merchantability under Illinois law, a plaintiff must show that (1) the defendant sold goods that were not merchantable at the time of sale; (2) the plaintiff suffered damages as a result of the defective goods; and (3) the plaintiff gave the defendant notice of the defect." *Sunny Handicraft (H.K.) Ltd. v. Envision This!*, LLC, 2017 WL 1105400, at *16 (N.D. Ill. Mar. 24, 2017) (internal quotations and citation omitted). Merchantability describes the "ordinary purposes for which such goods are used," and may be "proven inferentially by direct or circumstantial evidence." *Oggi Trattoria & Caffe, Ltd. v. Isuzu Motors Am., Inc.*, 865 N.E.2d 334, 340–41 (Ill. App. Ct. 2007).

WTEC argues that the claim fails because "the cables passed testing at the time of installation," and that American Wire has provided no evidence "of any defect manifesting at the time of sale." [Dkts. 101 at 15; 115 at 14.] American Wire, meanwhile, argues that a factfinder could nonetheless determine that "a systemic defect [existed] at the time of manufacturing." [Dkt. 109 at 10.]

---

[7]     In this respect, the claim differs from Count II.

Merchantability may be proven through circumstantial evidence, and so American Wire's failure to prove a specific defect is not fatal. But it cannot square the law's requirement that "the defect in the [cables] existed when the goods left the seller's control," *Oggi Trattoria*, 865 N.E.2d at 341, with the undisputed fact that "[a]ll the cables passed megger testing … at installation and no insulation issues or defects were noticed." [Dkt. 110 at 8.]

*Miller v. Emerson Elec. Co.*, 2025 WL 964905 (N.D. Ill. Mar. 31, 2025), provides an apt comparison. There, the plaintiffs argued that a sink manufacturer breached the implied warranty of merchantability by selling garbage disposals made of zinc, rather than stainless steel, which they alleged "caused the disposal's premature corrosion." *Id.* at *2. But the plaintiffs failed to state a claim because the disposal, by admission, "worked properly for a time before prematurely failing." *Id.* at *6. The same is true here. For that reason, the implied warranty of merchantability claim fails as a matter of law, and WTEC is entitled to summary judgment.

### d. Implied Warranty of Fitness for a Particular Purpose

Under Illinois law, the implied warranty of fitness for a particular purpose attaches when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Rosenstern v. Allergan, Inc.*, 987 F. Supp. 2d 795, 804 (N.D. Ill. 2013) (citing 810 ILCS 5/2–315). No such warranty is created when "the intended use is no different from the ordinary use of the product." *Id.* (citing *Wilson v. Massey–Ferguson, Inc.*, 315 N.E.2d 580, 582 (Ill. App. Ct. 1974)).

WTEC correctly argues that the "cables were intended to be used, and in fact were used, for their ordinary purpose of transmitting electricity." [Dkt. 101 at 16.] In response, American Wire argues that they must also "work properly with other components of the facilities, withstand rigorous physical stresses, and not pose unreasonable safety risks." [Dkt. 109 at 11.] But these are qualities, not purposes. *See, e.g.*, *CooLab Foods, LLC v. Creamalicious, Inc.*, 669 F. Supp. 3d 696, 704 (N.D. Ill. 2023) ("a car's ordinary purpose is driving … and the ordinary purpose of ice cream – even 'specialty' ice cream – would be eating it"). Regardless, American Wire has not demonstrated why operability and safety, generally, are "peculiar to the nature of [it or its customer's] business." *Id.* (quoting the incorporated UCC provision's Comment).

American Wire argues that "factual dispute[s] regarding the purpose for which the cables were used, and whether that purpose was 'particular' or 'ordinary,' must be resolved at trial." [Dkt. 109 at 11 (citing *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 379 F. Supp. 2d 968, 984-86 (N.D. Ill. 2005)]. But in *Loeffel Steel*, the disputed 'purpose' question was foreseeability, not whether it was particular or ordinary. 379 F. Supp. 2d at 984. And, in any event, questions of fact persisted. *Id.* at 985–86.

Having failed to provide evidence for—or even allege—a non-ordinary purpose for the cables, American Wire's final warranty claim cannot survive summary judgment.

## B.  Motion to Dismiss

Separately, American Wire moved to dismiss with prejudice Count I—its own claim for a declaratory judgment of its "rights and obligations under the Settlement Agreement." [Dkt. 113; Dkt. 66 ¶ 82.] When considering a plaintiff's attempt to dismiss its own claim, courts consider "delay by the movant, undue prejudice to the non-movant, motive and sufficiency of the explanation, and the expense of preparation for trial." *Synergy Glob. Outsourcing, LLC v. Sagility Operations Inc.*, 2024 WL 3757081, at *7 (N.D. Ill. Aug. 9, 2024).

WTEC curiously opposes dismissal, despite having argued in its motion for summary judgment that the claim for declaratory judgment "serves no useful purpose and should be dismissed" because it overlaps with the substantive breach of contract claim. [Dkt. 101 at 14.] Specifically, WTEC argues that dismissing the declaratory judgment claim would "depriv[e] it of a ruling on the merits of its summary judgment motion and undermine the substantial resources already expended." [Dkt. 115 at 8.] The court is not persuaded. For reasons discussed *supra* Part II.A.1, WTEC is not entitled to summary judgment on the underlying merits. If summary judgment *was* granted on Count I, it would only be because of 'overlap' between Counts I and II, as WTEC itself argued in its initial brief. [*Id.*] Further, because of that overlap, WTEC has not suffered prejudice from expending resources, since those same resources will have gone toward litigating the substantive breach of contract claim.[8] For these reasons, the circumstances are necessarily different than those in WTEC's cited cases. *Cf. Synergy Glob. Outsourcing*, 2024 WL 3757081, at *7 (N.D. Ill. Aug. 9, 2024) (declining to grant motion to dismiss so as not to deprive defendant of favorable summary judgment ruling); *Pace v. S. Exp. Co.*, 409 F.2d 331, 334 (7th Cir. 1969) (affirming denial of motion to dismiss *entire* action after "considerable discovery" and with motion for summary judgment pending).

Nor does granting American Wire's motion open the door for gamesmanship, since the dismissal is with prejudice. American Wire can neither shop for a new forum *see Diaz v. Ameriquest Mortg. Co.*, 2014 WL 26265, at *4 (N.D. Ill. Jan. 2, 2014), nor re-file to harass WTEC or prolong the litigation. *Pace*, 409 F.2d at 334. And because the substantive claim survives summary judgment, granting the motion does not permit American Wire to sidestep an adverse judgment, as WTEC also argues.

---

[8]     For this reason, the court declines to award WTEC attorney's fees. WTEC cannot realistically show it devoted any time to defending against Count I that did not also cover Count II. Except, perhaps, in writing 130 words in a 5,252 memorandum supporting summary judgment.

Therefore, the court agrees that, following American Wire's settlement with Signal, its claim for damages in Count II is the proper remedy. As WTEC noted in its motion for summary judgment, the overlapping claim for declaratory judgment serves no useful purpose and can be dismissed.[9]

## III. Conclusion

For the foregoing reasons, American Wire's motion for summary judgment is denied, and WTEC's motion for summary judgment is granted in part and denied in part. It is granted as to Count III (breach of purchase order), Count V (breach of implied warranty of merchantability), and Count VI (breach of implied warranty of fitness for a particular purpose). It is denied as to Count II (breach of indemnification clause) and Count IV (breach of express warranty). American Wire is also granted leave to file an amended complaint that omits Count I (declaratory judgment), which is effectively dismissed with prejudice.

Enter: 23-cv-4678
Date: November 7, 2025

_____
Lindsay C. Jenkins

---

[9]     American Wire brought this motion under Rule 41(a)(2), which speaks not of dismissing one claim, but the whole action. *Taylor v. Brown*, 787 F.3d 851, 857 (7th Cir. 2015)). Following the Seventh Circuit's lead in *Taylor,* this court construes the motion as a Rule 15(a) motion for leave to amend. *Id.* at 858. Courts "should freely give leave when justice so requires," as it does here. Fed. R. Civ. P. 15(a)(2).